**J. Todd CLOUSE, Plaintiff–Respondent,**

v.

**Jerry MYERS and Patricia Myers, Defendants–Appellants.**

**No. 15303.**

Missouri Court of Appeals,
Southern District,
Division One.

June 24, 1988.

William C. Crawford, Carthage, for plaintiff-respondent.

Thomas L. Williams, Joplin, for defendants-appellants.

GREENE, Presiding Judge.

Defendants Patricia Myers and her husband, Jerry Myers, (the Myers) appeal from a judgment in a court-tried breach of contract case. The judgment awarded plaintiff J. Todd Clouse (Clouse) $7,500 on his claim for damages, and denied relief to the Myers on their counterclaim.

No findings of fact and conclusions of law were requested or made by the trial court; therefore, all fact issues will be considered found in accordance with the result reached. *Crockett v. Morelock,* 608 S.W.2d 530, 531 (Mo.App.1980).

Relevant facts are as follows. In January 1987, Patricia Myers was operating the Green Door tavern' in Granby, Newton County, Missouri. Mrs. Myers had a three-year lease, beginning on April 15, 1986, on the premises from owner John Hurn, Jr., for $500 a month. She had a sole owner, 5 percent beer by-the-drink license issued by the Missouri Division of Liquor Control.

In addition to the lease, the assets of the business consisted of the stock of beer on hand, glassware, an air conditioner and a beer box.

Clouse was a patron of the Green Door. During one of his visits to the tavern, Jerry Myers asked Clouse if he would be interested in purchasing an interest in the business. Negotiations followed which ultimately led to the signing of an agreement between Clouse and the Myers. The agreement, titled "Employment/Management Contract," was executed on January 28, 1987. In the contract, the Myers are referred to as "Employers" and Clouse as "Employee." It recited that (1) the Myers operated the Green Door pursuant to a contract with John Hurn "which provides a four year lease with option to purchase," (2) the Myers agreed to hire Clouse to manage the business for a four-year period, with Clouse to receive 60 percent of the net profit of the business as salary, and (3) Clouse pay to the Myers $15,000, with $7,500 to be paid at the time of the signing of the contract and the remainder at a later date. In return for fulfillment of the contract, Clouse was to receive, at the termination of the agreement or upon the exercise of the lease option to purchase, whichever came first, a 60 percent ownership interest in the Green Door, with the Myers agreeing to exercise their option to purchase the property from John Hurn within the lifetime of their lease with him. The agreement further provided that upon purchase of the property from Hurn, the Myers and Clouse were each to pay 50 percent of the purchase price.

After execution of the contract, Clouse paid $7,500, by check made payable to Patricia Myers, and began operating the tavern. Approximately two weeks later, Clouse received a telephone call from Larry Fuhr, an agent with the Missouri Division of Liquor Control, and was told to bring his contract with the Myers and the liquor license (Patricia Myers') to the Joplin Police Station where Fuhr's office was located. Clouse complied. The Myers were also at Fuhr's office. Fuhr instructed Jerry Myers to wait in the hallway, while Clouse, Clouse's father, and Patricia Myers were taken into Fuhr's office. At trial, Clouse related that the following conversation then took place:

Q. Tell us what happened in that room?

A. Mr. Fuhr gave the license to Mrs. Meyers [sic] and asked her if she would give them up voluntarily or he would charge her with fraud because of the contract and she gave the license back to him, said she would give them up voluntarily.

Q. Did he say why the contract was fraud in his opinion?

A. Because Mr. Meyers' [sic] signature was on it.

Q. And what difference does that make?

A. Mr. Meyers [sic] was a convicted felon.

Q. All right. Go ahead, Todd.

A. And wasn't able to have anything to do with the operation of a club of any kind.

Q. All right. So Mrs. Meyers [sic] gave the license to Mr. Fuhr, is that correct? And what happened then?

A. He told her the reason for that. She was supposed to contact Mr. Fuhr within ten days after I started working there and they didn't do it, so that was some violation of some law.

Q. What happened then?

A. Not real sure.

Q. Did the meeting end shortly after the license was given up and the reasons were given?

A. Yes.

At trial, Clouse admitted that he knew that the liquor license was in Patricia Myers' name alone before he signed the agreement, and that the contract was an agreement for him to purchase 60 percent of the business, and was not an employment/management contract.

Fuhr was called as a witness by Clouse. He testified that after he became aware that the ownership of the Green Door had changed, he phoned Mrs. Myers and told her that if she sold part of the business, she would have to form a partnership and

apply for a new license in the names of the partners. During the meeting in his office, Fuhr told Mrs. Myers that she could be "cited" for failure to comply with his instructions, and that such action might interfere with her getting a liquor license to operate a bar which she was planning to open in Carthage, Missouri. He said that Mrs. Myers then voluntarily relinquished her liquor license to Fuhr.

Clouse later applied for and received a liquor license to operate the tavern in his own name, and renegotiated the lease of the premises with Hurn, retaining the inventory that he had obtained from the Myers. Clouse requested that the Myers return his $7,500. When they refused to do so, he filed a lawsuit against them, claiming that he had been induced to enter into the "Employment/Management" contract by the false representations of Jerry Myers "that he was a partner in the business which formed the subject matter in said contract and held a leasehold interest in the business property," when in fact neither representation was so. The petition further alleged that as a direct result of such false representations, the Missouri Division of Liquor Control withdrew the Green Door liquor license, thus triggering that portion of paragraph 12 of the contract which provided that should the Myers engage in any act which would have the direct result of the loss of the liquor license, any monies paid by Clouse to the Myers would be refunded.

The Myers filed a counterclaim, denying they had breached the contract, and claiming that Clouse still owed them $7,500 on the contract.

The trial court entered judgment for Clouse on his petition and against the Myers on their counterclaim. This appeal followed.

In their first point relied on, the Myers contend the trial court erred in granting judgment for Clouse because he failed to prove that Jerry Myers made any misrepresentations with the intent or purpose to deceive Clouse, on which Clouse relied, which misrepresentations induced him to sign the agreement in question. We are inclined to agree, and reverse the judgment entered in favor of Clouse on his petition.

The essential elements of actionable fraud are (1) that a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made, (2) that the representation was made with intent to deceive and for the purpose of inducing the other party to act upon it, (3) that the other party relied on the statement and was induced to act by it, and (4) was damaged thereby. Existence of fraud is never presumed, and each of its essential elements must be proven by the party asserting it. Failure to prove all of the essential elements is fatal. *Kreutz v. Wolff,* 560 S.W.2d 271, 277–78 (Mo.App.1977).

■ There is nothing in the record, other than representations in the contract language itself, indicating that Jerry Myers induced Clouse to do anything, or that he misrepresented anything to Clouse. While the contract language leaves the impression that Patricia Myers and Jerry Myers were partners in the Green Door operation, Clouse knew that the liquor license for the Green Door was issued solely in Patricia Myers' name. He further testified that at the time he signed the contract he knew it was not an "Employment/Management Contract," but was, in fact, a partnership agreement, and the reason that the agreement was labelled an employment/management contract "was so we could still operate under Patricia's license."

There is nothing in the record relative to the lease of the premises relevant to the issues here. While the lease agreement was between Hurn and Patricia Myers, and the agreement between the parties states that employers (the Myers) operated the business "pursuant to a contract entered into between themselves and one Johnny Hurn which provides a four year lease with option to purchase," there is nothing in the record to show that Clouse relied on such representation to his detriment. The reason Fuhr questioned the agreement was not because of the lease, but because an unlicensed person (Clouse) had entered into

a partnership agreement with a licensed person (Patricia Myers) to operate a tavern.

It is unlawful for any person, firm, partnership or corporation to sell or expose for sale in this state any intoxicating liquor without first obtaining a license. § 311.050.[1] Five percent beer is intoxicating liquor. § 311.020. Clouse, as well as Patricia Myers, was violating the law when he knowingly entered into the subterfuge of calling the partnership agreement an employment/management contract so that they could operate the business on Patricia's license, without an attempt being made to secure a new partnership license, which the record indicates could have been done. There is lack of proof on the issues of reliance and damages, which of itself would defeat the attempt of Clouse to recover on the ground of fraud. Additionally, neither law nor equity can be invoked to redress a wrong that has resulted from the injured party's own wrongful and illegal conduct. *De Mayo v. Lyons*, 358 Mo. 646, 216 S.W.2d 436, 439 (1948). This principle of law also applies to the counterclaim of the Myers, as they should not be able to get another $7,500 from Clouse through reliance on an illegal agreement which they knew, or should have known, was illegal at the time they entered into it.

The judgment in favor of Clouse and against Patricia Myers and Jerry Myers in the sum of $7,500 plus interest is reversed. The judgment in favor of Clouse and against Patricia Myers and Jerry Myers on the Myers' counterclaim is affirmed.

CROW, C.J., and HOLSTEIN, J., concur.

1. Unless otherwise indicated, all references to statutes are to RSMo 1978, V.A.M.S.